### BABOQUIVARI CATTLE CO. v. COMMIS-SIONER OF INTERNAL REVENUE.

No. 10292.

Circuit Court of Appeals, Ninth Circuit.

April 5, 1943.

John W. Townsend and Lloyd Fletcher, Jr., both of Washington, D. C., and Ralph W. Bilby and T. K. Shoenhair, both of Tucson, Ariz., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Joseph M. Jones, and Maryhelen Wigle, Sp. Assts. to Atty. Gen., for respondent.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

Petition to review a decision of the Board of Tax Appeals sustaining the assessment of deficiencies in income taxes for 1937 and 1938. The case concerns the taxability as income of payments made to the petitioner by the United States in accordance with the Soil Conservation and Domestic Allotment Act.[1]

Petitioner is an Arizona corporation. In the taxable years it was engaged in the operation of a cattle ranch comprising 57,200 acres. Of the ranch area 7,319 acres belonged to petitioner and 45,880 acres to the state of Arizona, the latter being held under grazing leases of from five to ten years. Included also were 4,000 acres of public lands of the United States occupied under the provisions of the Taylor Grazing Act, Act of June 28, 1934, 48 Stat. 1269, 43 U.S.C.A. §§ 315 et seq., 1171. We are informed by counsel that the entire area was under fence. The land is in a semi-arid region in the watershed of the Gila River. The major portion of the rainfall there occurs during three summer months, and the ranch lands as well as the general area surrounding them are subject to substantial erosion.

During the taxable years petitioner constructed or rebuilt some dirt reservoirs and earthen tanks, built a rubble masonry dam and two miles of drift fence, deepened a well, and developed a spring or seep. All of the 1937 improvements were made on the lands leased from the state. Of those made in 1938, a minor part were on petitioner's own holdings and the balance on the leased state land. Before these improvements were undertaken a range grazing examiner, working in conjunction with the Pima County Range Conservation Com-

mittee, had made a survey and had recommended the improvements. The examiner's first report was approved by the committee in July 1937, on which date the petitioner was advised by the committee that upon the completion and approval of the recommended improvements an application for benefit payment would be submitted for petitioner's signature. Petitioner was advised that in accordance with the Soil Conservation Act and the regulations thereunder a maximum payment of $3,487.50 might be earned. Substantially the same procedure was followed in 1938.

Upon completion of a portion of the work in 1937 payment to petitioner was authorized in the amount of $3,586.89, and on completion of the remainder in 1938 there was a payment of $3,247.74, these allowances being computed upon the basis of acreage and the number of animal units grazed thereon. The cost of the work to petitioner in each year exceeded the amounts received from the United States. In petitioner's books of account the cost of the improvements was not charged to profit and loss, but was treated as a capital item or as a credit to capital surplus, and was carried into an asset account entitled "improvements under federal aid." In the income returns the amounts were shown as carried upon petitioner's books, but were not included in gross income. The Commissioner added the annual payments to the net income reported, and the Board sustained the assessment.

It is plain that the moneys received were not exempt as gifts under § 22(b) (3) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 825; they were earned payments made upon a consideration. On oral argument petitioner did not seriously contend that they were gifts. Its contention, in summary, is that the payments were not income at all, but capital subsidies. The taxpayer attempts to distinguish between types of payments made under the Act, those for inaction—as for refraining from production or for producing a limited amount only of a given crop—being said by petitioner to be classifiable as "income subsidies" because designed to supplement income; whereas subsidies for positive outlays such as those made here are said, on the authority of Edwards v. Cuba Railroad Co., 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124, to be classifiable as "capital subsidies."

[1] Act of April 27, 1935, 49 Stat. 163, as amended by Act of February 29, 1936, 49 Stat. 1148, 16 U.S.C.A. § 590a et seq.

■ We are not able to discover in the Act or in the administrative practices of the Department of Agriculture any justification for these nice distinctions. We think the pertinent regulations of the Secretary afford no basis for them. Under these regulations a farmer is not entitled to receive or retain a payment if he has pursued practices tending to defeat the conservation program.[2] Thus a beneficiary does not earn a payment merely by making an improvement; he earns it in part by compliance with conditions in respect of the proper use of his land. For example, if the utility of a range has been improved by the building of a reservoir, the right to have or retain the subsidy for the improvement would be defeated if the grower overgrazes his land or indulges in similar injurious practices.[3]

It is of little importance, we think, what name be applied to the payments, whether they be called "subsidies" as insisted upon by the taxpayer, or "benefits" as they were termed by the Board. In either event they are within the broad concept of income as that term is defined in § 22(a) of the 1936 Act.[4] Consult Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570. No part of the sums paid to the petitioner were required to be placed by him in a particular account or fund. The payments were not earmarked, nor was there any restriction on their use. Petitioner was free to use the money for any purpose it might see fit, as to defray operating expenses or to pay dividends or to purchase an automobile. Obviously, the manner in which the taxpayer entered the items on its books is of no moment.

It is argued that the conservation program is carried on in the interest of the general good, not for the benefit of the individual; and that upon no other theory can the congressional appropriations be justified. While the statement may for the purpose of decision be accepted as true, it is undeniable that the mainspring of the activities of the individual recipient is self-interest. The improvement he makes is of advantage to himself in the conduct of his affairs, and he, not the public, gets the money for participating in the land conservation program. Again, it is said that the intent can not rationally be ascribed to Congress to bestow a benefit with one hand and to take it away with the other. We do not agree; many people are undergoing a like experience. Congress was not unaware that huge amounts would be distributed to farmers and livestock growers under the Act, yet it has made no provision exempting the payees from the inclusion of the payments in their income returns.

We think the case of Edwards v. Cuba Railroad Co., supra, is distinguished by what has been said. The situation here is more nearly like those involved in Texas & Pacific Ry. Co. v. United States, 286 U.S. 285, 52 S.Ct. 528, 76 L.Ed. 1108; Helvering v. Claiborne-Annapolis Ferry Co., 4 Cir., 93 F.2d 875; and Lykes Bros. S. S. Co. v. Commissioner, 5 Cir., 126 F.2d 725, where analogous governmental payments were held to be taxable income.

Affirmed.

---

[2] Consult 1937 WR Bulletin No. 101-Arizona—Supplement 2—Part VI, Section 3.

[3] The basis of payment is aptly summarized in the 1938–39 report of the Agricultural Adjustment Administration, page 22, as follows: "Under the range program, an allowance is established for each participating ranch. The allowance is determined on the basis of the number of animal units which the ranch is capable of carrying and the number of acres in the ranch. The rancher may earn this allowance by carrying out practices at rates of payment established for various range-improving practices included in the range conservation program."

[4] " 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *" 26 U.S.C.A. Int.Rev.Acts, page 825.