[924 NE2d 801, 897 NYS2d 693]

In the Matter of LIGHTHOUSE POINTE PROPERTY ASSOCIATES LLC, Appellant, v NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION et al., Respondents.

Argued January 5, 2010; decided February 18, 2010

**POINTS OF COUNSEL**

*Knauf Shaw LLP*, Rochester (*Alan J. Knauf, Linda R. Shaw, Amy Reichhart* and *Dwight Kanyuck* of counsel), for appellant. I. The definition of "brownfield" has a low threshold. (*Parker v Scrap Metal Processors, Inc.*, 386 F3d 993; *Matter of Chemical Specialties Mfrs. Assn. v Jorling*, 85 NY2d 382; *State of New York v Shore Realty Corp.*, 759 F2d 1032; *Matter of East Riv. Realty Co., LLC v New York State Dept. of Envtl. Conservation*, 22 Misc 3d 404; *Building & Constr. Trades Council of Buffalo, N.Y. & Vicinity v Downtown Dev., Inc.*, 448 F3d 138; *Matter of Destiny USA Dev., LLC v New York State Dept. of Envtl. Conservation*, 63 AD3d 1568; *Buffalo Dev. Corp. v New York State Dept. of Envtl. Conservation*, 23 Misc 3d 1129[A], 2009 NY Slip Op 51001[U]; *Matter of HLP Props. LLC v New York State Dept. of Envtl. Conservation*, 21 Misc 3d 658.) II. The New York State Department of Environmental Conservation misinterprets title 14 of ECL article 27 by equating "may complicate" to "requires remediation." (*Knight v Amelkin*, 68 NY2d 975; *Matter of Toys "R" Us v Silva*, 89 NY2d 411; *Matter of Raritan Dev. Corp. v Silva*, 91 NY2d 98; *Matter of KMO-361 Realty Assoc. v Davies*, 204 AD2d 547, 84 NY2d 811; *Matter of Nilsson v Department of Envtl. Protection of City of N.Y.*, 28 AD3d 773, 8 NY3d 398; *Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451; *Matter of Moran Towing & Transp. Co. v New York State Tax Commn.*, 72 NY2d 166; *Matter of Evans v Tax Appeals Trib. of State of N.Y.*, 199 AD2d 840; *Matter of SIN, Inc. v Department of Fin. of City*

*of N.Y.,* 71 NY2d 616; *Matter of Chemical Specialties Mfrs. Assn. v Jorling,* 85 NY2d 382.) III. Respondents can only rely on their actual administrative decision to exclude solid waste, which is contrary to the statute. (*Matter of Aronsky v Board of Educ., Community School Dist. No. 22 of City of N.Y.,* 75 NY2d 997; *Matter of Scanlan v Buffalo Pub. School Sys.,* 90 NY2d 662; *Matter of Trump-Equitable Fifth Ave. Co. v Gliedman,* 57 NY2d 588; *Destiny USA Dev., LLC v New York State Dept. of Envtl. Conservation,* 19 Misc 3d 1144[A], 2008 NY Slip Op 51161[U], 63 AD3d 1568; *Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs.,* 77 NY2d 753; *Matter of Chemical Specialties Mfrs. Assn. v Jorling,* 85 NY2d 382; *Matter of Yarbough v Franco,* 95 NY2d 342; *Matter of Millpond Mgt., Inc. v Town of Ulster Zoning Bd. of Appeals,* 42 AD3d 804; *B.F. Goodrich Co. v Murtha,* 958 F2d 1192; *B.F. Goodrich v Betkoski,* 99 F3d 505.) IV. New York State Department of Environmental Conservation has acted contrary to its own prior decision-making. (*Knight v Amelkin,* 68 NY2d 975; *Matter of Callanan Indus. v Rourke,* 187 AD2d 781; *Matter of Charles A. Field Delivery Serv. [Roberts],* 66 NY2d 516; *Matter of Citizens' Envtl. Coalition, Inc. v New York State Dept. of Envtl. Conservation,* 57 AD3d 1279.)

*Andrew M. Cuomo, Attorney General,* Albany (*Denise A. Hartman, Barbara D. Underwood* and *Andrea Oser* of counsel), for respondents. I. The Department of Environmental Conservation's well-reasoned determination denying petitioner's acceptance into the Brownfield Cleanup Program should be confirmed. (*377 Greenwich LLC v New York State Dept. of Envtl. Conservation,* 14 Misc 3d 417; *Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast,* 9 NY3d 219; *Matter of Village of Scarsdale v Jorling,* 91 NY2d 507; *Matter of Fineway Supermarkets v State Liq. Auth.,* 48 NY2d 464; *Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451; *Flacke v Onondaga Landfill Sys.,* 69 NY2d 355; *Matter of Chemical Specialties Mfrs. Assn. v Jorling,* 85 NY2d 382; *Matter of Binghamton-Johnson City Joint Sewage Bd. v New York State Dept. of Envtl. Conservation,* 159 AD2d 887; *Matter of East Riv. Realty Co., LLC v New York State Dept. of Envtl. Conservation,* 22 Misc 3d 404; *Matter of HLP Props. LLC v New York State Dept. of Envtl. Conservation,* 21 Misc 3d 658.) II. The "working definition" that petitioner proposes must be rejected. (*Matter of East Riv. Realty Co., LLC v New York State Dept. of Envtl. Conservation,* 22 Misc 3d 404.) III. The Department of Environmental Conservation did not base its determination on the fact that petitioner's property is a former solid waste landfill. IV. If the Court holds that the Department

of Environmental Conservation employed an improper construction of the statute, it should remand to the agency for reconsideration in light of the Court's decision. (*Matter of Rhino Assets, LLC v New York City Dept. for the Aging, SCRIE Programs,* 31 AD3d 292; *Matter of Eastern Pork Prods. Co. v New York State Div. of Hous. & Community Renewal,* 187 AD2d 320; *Klostermann v Cuomo,* 61 NY2d 525.)

**OPINION OF THE COURT**

READ, J.

Petitioner Lighthouse Pointe Property Associates LLC (Lighthouse) commenced this CPLR article 78 proceeding to challenge the decision by the New York State Department of Environmental Conservation (DEC or the Department) to deny its requests for acceptance of certain real property into the Brownfield Cleanup Program (BCP). For the reasons that follow, we conclude that DEC acted arbitrarily and capriciously and contrary to law when it determined that the real property addressed in Lighthouse's requests did not fall within the statutory definition of a brownfield site.

I.

In 2003, the Legislature enacted a new title 14 of article 27 of the New York State Environmental Conservation Law to promote the voluntary cleanup, reuse and redevelopment of brownfields through the BCP, to be administered by DEC (*see* L 2003, ch 1 [eff Oct. 7, 2003]). The Legislature found "that there are thousands of abandoned and likely contaminated properties that threaten the health and vitality of the communities they burden, and that these sites, known as brownfields, are also contributing to sprawl development and loss of open space" (ECL 27-1403). As the Division of the Budget put it when endorsing the legislation,

> "[b]rownfields are abandoned, idled, or under-used properties where redevelopment is complicated by real or perceived environmental contamination . . . [and they] often pose not only environmental, but legal and financial, burdens on communities. Left vacant, contaminated sites can diminish the property value of surrounding property and threaten the economic viability of adjoining properties. The impediments to brownfield redevelopment are

complex . . . The existing liability scheme, which holds all owners of contaminated property liable for cleanup costs, regardless of when or how the property was acquired relative to the contamination, contributes to the reluctance of developers to purchase even minimally contaminated sites. So, too, does the potential cost of cleanup, which may not be known at the time of purchase. In addition, lenders are often reluctant to extend credit for the purchase and cleanup of brownfield sites, fearing future liability or diminution of the value of the property held as collateral should the site prove to require more extensive and costly cleanup than initially thought. Consequently, financing such a purchase may be more difficult than financing a purchase of a greenfield site" (Budget Report on Bills, Bill Jacket, L 2003, ch 1, at 38).

The BCP broadly defines the term "brownfield site" as *"any* real property, the redevelopment or reuse of which *may be complicated* by the *presence or potential presence* of a contaminant" (ECL 27-1405 [2] [emphases added]). "Contaminant" is defined as "hazardous waste and/or petroleum as such terms are defined in [ECL 27-1405]" (ECL 27-1405 [7-a]); and "hazardous waste," in turn, includes hazardous waste as defined in ECL 27-1301 (*see* ECL 27-1405 [17], referencing ECL 27-1301; *see also* ECL 27-1301 [1], referencing ECL 27-0903 ["Identification and listing of hazardous waste"] and ECL 37-0103 ["Lists of substances hazardous or acutely hazardous to public health, safety or the environment"]). There are statutory exclusions from the definition of the term "brownfield site," notably including certain properties listed in the State's Registry of Inactive Hazardous Waste Disposal Sites (the Registry), a hallmark of the State's Superfund Program, or properties included on the National Priorities List, comprising designated federal Superfund sites (*see* ECL 27-1405 [2] [a], [b]).

"A person who seeks to participate in [the BCP] shall submit a request to [DEC]" on forms devised by the Department, and shall provide therein information "sufficient to allow [DEC] to determine eligibility and the current, intended and reasonably anticipated future land use of the site" (*see* ECL 27-1407 [1]). There are enumerated restrictions on eligibility (ECL 27-1407 [8], [9]). Among them is the direction that DEC "shall reject" any request that it "determines . . . is for real property which

does not meet the requirements of a brownfield site as defined in . . . title [14]" (ECL 27-1407 [8] [a]).

An applicant[1] must enter into an agreement with DEC to conduct an investigation to assess the nature and extent of contamination at the brownfield site (ECL 27-1409, 27-1411), and must devise and carry out a "remedial program" that DEC judges to be "protective of public health and the environment" (ECL 27-1415 [1], [2]). DEC issues a written certificate of completion to the applicant once the site has been cleaned up in accordance with the applicable remedial requirements (ECL 27-1419 [3]); the certificate is transferrable to an applicant's successors or assigns (ECL 27-1419 [5]). Further, the certificate qualifies the applicant to receive a liability release and covenant not to sue from the State of New York, which "run[s] with the land" (ECL 27-1421 [1], [3]), as well as financial benefits (Tax Law §§ 21, 22 [b]; § 23 [a]). Public notice and opportunities for citizen participation are integral features of the BCP at every stage, from the request to participate to issuance of the certificate (ECL 27-1417).

The statute directed DEC to develop tables of numeric and contaminant-specific soil cleanup objectives (SCOs) that protect public health and the environment and do not exceed specified risk levels based on three types of land use—unrestricted (residential), commercial, and industrial (ECL 27-1415 [6]; *see also* 6 NYCRR subpart 375-6). Further, the BCP affords applicants the flexibility to employ the tables or site-specific criteria to determine acceptable levels of residual contamination, based on four different cleanup "tracks."[2]

As originally enacted, the most significant financial incentive available to an applicant—the brownfield redevelopment tax

---

1. An "applicant" is "a person whose request to participate in the [BCP] . . . has been accepted by [DEC]" (ECL 27-1405 [1]).

2. A track 1 remedial program generally achieves a cleanup level and the SCOs appropriate for unrestricted residential use (as published in the relevant generic table) without reliance on any institutional (e.g., a deed restriction) or engineering (e.g., a clay cap or a groundwater pump-and-treat system) controls; a track 2 remedial program cleans up soils to meet the SCOs for commercial or industrial use (as published in the relevant generic tables), and may include institutional and/or engineering controls; a track 3 remedial program takes site conditions (such as depth to groundwater) into account to develop site-specific SCOs to be met; and a track 4 remedial program achieves a site-specific cleanup level protective of current, intended or reasonably anticipated residential, commercial, or industrial use with restrictions, and relies on institutional and engineering controls to do this (ECL 27-1415 [4]).

credit—ranged from 10% to 22% of covered costs.[3] This tax credit consists of a "site preparation credit component" (costs to get the site ready for cleanup and redevelopment, except for the cost of acquiring the real property) (Tax Law § 21 [a] [2]; [b] [2]); a "tangible property credit component" (the cost of erecting commercial, industrial or recreational buildings) (Tax Law § 21 [a] [3]; [b] [3]); and an "on-site groundwater remediation credit component" (Tax Law § 21 [a] [4]; [b] [4]).

Early on, DEC estimated the value of tax credits—"[a]mong the most powerful incentives established by" the BCP—to be "approximately $135 million when . . . fully effective" (Desnoyers and Schnapf, *Environmental Remediation Process Is Undergoing Sweeping Changes Mandated by New Brownfields Law*, 76 NY St BJ [No. 8] 10, 20-21). As it turned out, since the tangible property credit component "potentially amount[ed] to as much as 22 percent of the total cost of development of the project," sites with minimal contamination but high development costs were eligible for "very large tax credits with a relatively small investment" in cleanup costs (Block and Curran, Construction Law, *Brownfields Cleanup: Case Law, Amendments May Modify Program*, NYLJ, Mar. 12, 2008, at 5, col 3).

In June 2008, the State Comptroller estimated that "[t]he outstanding tax credit liability for all projects [then] enrolled in the BCP . . . [was] potentially as high as $3.1 billion" (Thomas P. DiNapoli, New York State Comptroller, *Overview of the New York State Brownfields Cleanup Program*, at 9 [June 2008] [available at http://www.osc.state.ny.us/reports/environmental/brownfields08.pdf (cached at http://www.nycourts.gov/reporter/webdocs/brownfields08.pdf)]). Indeed, "[s]everal projects [had] accrued tax credits in excess of $100 million [causing] the New York State Division of the Budget" to "express[ ] concern that the [BCP might] pose a significant financial risk to the state" (*id.* at 2).

These financial misgivings caused the Legislature to include a 90-day moratorium on the acceptance of new sites into the BCP as part of the enacted state budget for fiscal year 2008-2009, and subsequently to enact amendments revamping the brownfield redevelopment tax credit for applicants accepted into the BCP after June 23, 2008 (*see* L 2008, ch 390, §§ 1, 2). The

---

**3.** Other financial incentives include a tax credit for real property taxes for up to 10 years, calculated according to a formula that takes the number of employees at the site into account (Tax Law § 22 [b]), and a one-time insurance credit (Tax Law § 23 [a], [c]).

amendments restructured the tax credits so as to encourage more thorough cleanups while reducing the State's financial exposure. First, the Legislature tied the percentage of remedial costs (i.e., the site preparation and groundwater remediation credit components) available to the level of cleanliness achieved, ranging from a high of 50% for soil cleanups allowing for unrestricted use to a low of 22% for track 4 soil cleanups for industrial use (ECL 27-1419 [3]). Importantly, the Legislature capped the tangible property credit component, which captures development costs, to the lesser of $35 million or three times remedial costs; or, for sites used primarily for manufacturing activities, to the lesser of $45 million or six times remedial costs (Tax Law § 21 [3-a]).

The BCP replaced the Voluntary Cleanup Program (VCP), an administrative initiative inaugurated by DEC in late 1994 to accommodate "developers and landowners with contaminated but otherwise marketable property [who] sought government review and 'sign-off' of cleanup plans so that they could access financial backing and be freed from worry over potential legal actions under the State's pollution and hazardous waste laws" (Testimony of Peter Grannis, Commissioner, New York State Department of Environmental Conservation, before the New York State Senate and Assembly Standing Committees on Environmental Conservation, Aug. 27, 2007). The VCP offered no financial incentives; however, upon completion of a DEC-sanctioned cleanup, a participant in the VCP received a waiver of liability from DEC—i.e., the waiver did not bind other state agencies or the State Attorney General. Despite its perceived shortcomings, the VCP "evolved into a well-recognized way for property owners to obtain official sanction for their cleanups" (Gerrard, Environmental Law, *N.Y. Brownfields Program Buffeted by Legislature, Courts*, NYLJ, July 25, 2008, at 3, col 1), which paved the way for redevelopment and reuse of their property.

## II.

Lighthouse plans to redevelop land located along the Genesee River in Monroe County "into a vibrant, pedestrian-friendly and attractive $250 million mixed-use waterfront development, including condominiums, townhouses, a marina, restaurants,

retail stores and a hotel."[4] Most of the land, situated within a 100-year flood zone, encompasses what was historically a marsh area and is largely vacant. The occupied portions are used primarily for boat storage and parking. Lighthouse divided the land into two development parcels (collectively referred to as the properties): the 22-acre Riverfront Site, bordering the east side of the Genesee River in the Town of Irondequoit and the City of Rochester, close to the confluence of the Genesee River and Lake Ontario; and the 25.4-acre Inland Site, near the east side of the Genesee River.

Most of the Inland Site is located within the footprint of a city landfill that operated from the 1930s until at least 1960 and possibly into the 1970s. The landfill served as a depository for residential refuse, ash, slag, construction debris, and sewage sludge from a now demolished wastewater treatment plant operated on a portion of the Inland Site for approximately 60 years. In 1980, DEC listed the landfill in the Registry. DEC delisted the landfill in 1994; however, in 1998, DEC included it in a database of hazardous *substance* waste disposal sites that did not qualify for the Registry simply because hazardous waste, as that term of art was then defined by statute and regulation, was not discarded there.[5]

The Riverfront Site contains industrial waste, construction debris, sewage sludge, and residential refuse as fill material. A marina currently operates on a portion of it. In the early 2000s, the New York State Department of Transportation (DOT) replaced the Stutson Street Bridge across the Genesee River, which is accessed from the Riverfront Site. DOT also built a new road, which runs through the location of the former landfill on the Inland Site. DOT's project involved substantial excavation, and DEC permitted DOT to redeposit excavated material (an estimated 3,400 tons) within the Riverfront Site, properly covered. Testing of the excavated material for lead revealed that 6 of 93 soil samples failed the Toxicity Characteristic Leaching Procedure test, which is used to determine whether a solid waste is a hazardous waste because it exhibits the toxicity characteristic (*see* 6 NYCRR 371.3 [e]).

---

4. Lighthouse has entered into contingent agreements or options to purchase the land, except for those portions owned by the Town of Irondequoit and the City of Rochester.

5. Until enactment of the BCP in 2003, the definition of hazardous waste in ECL 27-1301 (1), applicable in the State's Superfund Program, was limited to listed or characteristic hazardous waste, and so did not encompass DEC's list of hazardous substances promulgated under article 37 of the ECL.

In 2006, Lighthouse filed two requests for acceptance into the BCP, one for the Riverfront Site and the other for the Inland Site. Those requests were supported by a remedial investigation report prepared by Lighthouse's environmental consultant. For both sites, Lighthouse summarized the consultant's report as follows:

> "Exceedances of the draft BCP restricted use residential SCOs were observed across the Site[s] in waste material and soil. Exceedances of NYS Ambient Water Quality Standards and guidance values were observed at all monitoring wells for metals. Additional well development and sampling was recommended. Soil vapor levels are elevated for VOCs [volatile organic compounds] and methane in areas of waste disposal. These levels will need to be addressed prior to residential development."

The consultant recommended various remedial measures, including site preparation by trained workers; vapor barriers and soil gas venting to prevent exposure to methane and other soil vapors; pavement and landscaping to address direct contact exposures; deed restrictions on groundwater use and soil/fill management; operation, maintenance and monitoring of the soil vapor collection system; preloading where filling occurred so as to reduce differential settlement; and foundation design to ensure future structural stability for all proposed structures. The cost to remedy the properties was estimated to range from $4 million to $8 million. By contrast, the total assessed value of the Riverfront Site was $1.3 million, and the total assessed value of the Inland Site was $1.2 million.

In June 2007—after Lighthouse submitted a letter demanding that DEC issue its long overdue decision—DEC denied the requests on the general ground that the properties were not brownfield sites within the meaning of ECL 27-1405 (2). DEC explained its decision as follows:

> "The Department reviewed the data and materials submitted with the applications . . . While there are some exceedances of the restricted residential [SCOs] contained in 6 NYCRR Subpart 375-6, for the most part, sampling results indicate levels that are well within [them]. There is no indication that contaminants as defined in ECL 27-1405.7 and 6 NYCRR Part 375-1.2 (g) (*i.e.* hazardous waste or

petroleum) are present at levels that would complicate the redevelopment or reuse of this property, nor is there any indication that there is a source of such contaminants. Rather, it is likely that any exceedances of SCO's or other standards are attributable to solid waste disposal. Pursuant to 6 NYCRR 37[5]-3.3 (a) (3) (ii), the Department does not consider material other than contaminants as defined under ECL Article 27, Title 14 in making a determination as to eligibility for the BCP.

"The Department recognizes that large portions of this property were formerly used as solid waste landfills, and that redevelopment of these properties is complicated by such prior use, given that methane gas is present and that odors, leachate seeps and soil stability present engineering concerns. However, these complicating factors are typical of solid waste landfills rather than specific sources of hazardous waste or petroleum contamination. For purposes of the BCP applications, there is no reasonable basis to believe that contamination or the potential presence of contamination, as defined in ECL Article 27, Title 14 and the regulations promulgated thereunder, is complicating the redevelopment or reuse of the property."

On July 26, 2007, Lighthouse brought this lawsuit against DEC, its Commissioner, and the Director of the Division of Environmental Remediation, asking Supreme Court to annul DEC's determination and order the agency to grant its requests for acceptance into the BCP. The Town of Irondequoit and the City of Rochester, both named as necessary parties, supported Lighthouse, as did Monroe County, which appeared amicus curiae.

First, Lighthouse emphasized the expansive statutory definition of the term "brownfield site" (i.e., *any* real property, the redevelopment or reuse of which *may be complicated* by the *presence or potential presence* of *a* contaminant" [emphases added]). With respect to the contaminants at the Riverfront Site, Lighthouse pointed out that its consultant's report "show[ed] exceedances of the restricted use residential SCOs . . . for numerous hazardous wastes, including benzo(a)anthracene, benzo(a)pyrene, benzo(b)flouranthene, lead and mercury." Further, "[l]ead contamination on the Riverfront Site [was] as high

as seven times the SCO standard"; and "[e]xceedances of ambient water quality standards, guidance values and background levels were observed at all groundwater monitoring wells," and included elevated levels of 18 metals. As for the Inland Site, testing revealed exceedances of the restricted use residential SCOs for numerous hazardous wastes, as well as exceedances of ambient water quality standards, guidance values and background levels at all groundwater monitoring wells. Moreover, soil vapor probes confirmed the presence of volatile organic compounds in excess of the United States Environmental Protection Agency's generic screening criteria for health risks for numerous hazardous substances, as well as high concentrations of explosive methane.

Second, Lighthouse stressed that contamination had stymied redevelopment of the properties. When the present owner of the largest portion of the Inland Site sought to develop the area of the former city landfill, DEC and the Monroe County Department of Public Health (MCDPH) objected. And in 2005, the MCDPH took the position that the Inland Site should never have been delisted by DEC, and that while "it may be possible to develop the site in a way that will be protective of human health . . . the only acceptable way to accomplish this is for the developer [i.e., Lighthouse] to participate in [DEC's] Brownfield Cleanup Program."

On December 4, 2007, DEC answered, and asked Supreme Court to dismiss Lighthouse's petition. DEC relied principally on the affidavit of the staff environmental engineer who recommended denying Lighthouse's requests for acceptance into the BCP. He opined that the "exceedances of soil and groundwater cleanup standards" at the properties were "limited in number compared with the large amount of data available"; and that "[t]he exceedances revealed by both historical and current sampling data were few in number, limited in magnitude, and widely dispersed." As a result, "[t]aken as a whole, the data [did] not indicate the presence of contamination at the [Riverfront and Inland Sites] in quantities or concentrations sufficient to require remediation."

Regarding exceedances of groundwater standards for metals, the DEC engineer surmised that turbidity in the samples might have compromised the data's reliability. Similarly, "[s]ince turbidity levels of all groundwater samples [were] high, there is a potential that the [semi-volatile organic compounds] detected were from sediments in the groundwater sample, and may not

be representative of groundwater quality." He took the position that the levels of polyaromatic hydrocarbons in soil and waste samples did "not indicate soil contamination that would require remediation . . . [but instead] reflect[ ] the level[s] . . . that are generally found in urban areas near asphalt pavement and railroads, as products of automobile exhaust, and as incomplete combustion products from coal"; and that the highly contaminated lead sample was an outlier. Finally, he added, the "highest values [of volatile organic compounds] in soil vapor were encountered . . . where there are no current structures. Whether indoor air in a structure later constructed in that area would pose a potential health risk cannot be determined from these exceedances."

The DEC engineer reasoned that "[b]y far the major factor impeding development of the property is its former use as a municipal solid waste landfill which was sited in a former wetland." For example, "[p]utrescible wastes in a typical municipal landfill have poor load bearing characteristics and settle at differential rates because of decaying refuse." He summed up by explaining that he had recommended denial of Lighthouse's requests for acceptance into the BCP because, based on his analysis of the data,

> "the quantities and concentrations of contaminants in soil, groundwater and soil vapor did not indicate the need for remedial action; . . .

> "redevelopment of the property is not complicated by the presence of contaminants; and

> "what complicates redevelopment of the property is its status as a former solid waste landfill, which is not a qualification for eligibility for the BCP."

In reply, Lighthouse submitted several affidavits to dispute DEC's verdict that the presence of contaminants at the properties did not call for remedial action, or complicate redevelopment. For example, its consultant's engineer claimed that DEC's engineer's conclusion that the sampling data indicated minimal contamination, not requiring cleanup, was "completely inconsistent with how [DEC] normally addresses sites with similar contamination," and gave illustrations.

A veteran real estate attorney and Lighthouse partner acknowledged that extra costs would be incurred "due to unstable ground . . . [because of] the presence of solid waste in the

Landfill, and because the entire port area is a historic marsh area . . . filled over the last two centuries"; and that Lighthouse understood that it would "be necessary to vent off methane gas generated by degeneration of waste in the Landfill." He maintained, however, that there was "no question that the Project is feasible, would get financed, and could proceed if these were the only issues"; and that what prevented Lighthouse from going forward was the presence of hazardous wastes at the Riverfront and Inland Sites. He noted that "[n]o one will finance [Lighthouse's project]" absent "[DEC's] approval of the investigation and remediation of hazardous wastes at the [properties], and a release of liability" because "[o]therwise the risks are too great for lenders, particularly due to the relative low value of property in Upstate New York compared to the rest of the country"; and that "the [MCDPH] continues to insist that [Lighthouse] undertake remediation, but there is no one to sanction it" since DEC "has disavowed jurisdiction" under the BCP.

The owner of the largest portion of the Inland Site recounted his unsuccessful attempt to develop a residential project on his property, which failed primarily because "government regulators, particularly the [MCDPH], which had to approve any subdivision . . . , believed that hazardous substances were present in the landfill, and this presented an unacceptable risk to residents who would purchase houses." Further, "financing institutions were unwilling to take the risk of placing a mortgage . . . because of the threat that residents would be exposed to toxic chemicals that could cause cancer."

And finally, the chief executive officer of a national brownfield redevelopment firm, which had secured a $23 million conditional loan commitment from a California-based financier of brownfield redevelopments to pay for remedial measures and site preparation at the properties, averred that "the paramount issue affecting the Project is the threat of uninsurable, open-ended environmental liability associated with the [properties]"; and that unless DEC "review[ed] and approve[d] the environmental investigations and remedial measures and grant[ed] an appropriate limitation of liability . . . neither brownfield redevelopers such as [his firm] nor brownfield financiers . . . [would] be willing to take on the multitude of other risks inherent in the Project."

On December 20, 2007, Supreme Court granted the petition and ordered DEC to accept the properties into the BCP,

discerning "no rational basis to conclude that the levels of contamination . . . were 'minimal.' " The court rejected DEC's argument that "SCO's should have no bearing whatsoever in determining whether a site is initially admitted into the BCP, yet these same standards should be the ultimate factor in determining whether an applicant receives a liability release after completion" of cleanup. In Supreme Court's view, the phrases "*may* complicate" and "*potential* presence" signified that the Legislature "intended a low threshold for admission into the BCP." Further, an investor's reluctance to invest absent DEC approval "would have to be seen as a possible complication to development," despite the Department's insistence to the contrary.

DEC appealed. On February 6, 2009, the Appellate Division, with one Justice dissenting, reversed Supreme Court's judgment, on the law, and dismissed the petition. The majority concluded that "DEC's well-reasoned analysis of the BCP applications of [Lighthouse], coupled with the mandate that we must not substitute our judgment for that of the DEC, compels the conclusion that the court erred in granting the petition and directing the DEC to accept petitioner into the BCP" (*Matter of Lighthouse Pointe Prop. Assoc. LLC v New York State Dept. of Envtl. Conservation*, 61 AD3d 88, 94 [4th Dept 2009]). The dissenting Justice characterized DEC's interpretation of the term "brownfield site" as "unreasonably narrow," given the broad statutory language and the Legislature's declaration of policy and findings of fact, both of which signaled an "intent to encompass a vast range of parcels that may be polluted" (*id.* at 96, 97). The Appellate Division subsequently granted Lighthouse's request for permission to appeal to us (61 AD3d 1438 [4th Dept 2009]), and we now reverse.

### III.

Because the BCP is meant to restore contaminated real property to productive use, DEC argues that the phrase "may be complicated" in the statutory definition of the term "brownfield site" is reasonably interpreted to mean that the property's redevelopment or reuse may be complicated by the need for a cleanup, an environmental decision of which it is the sole arbiter; and here,

"[f]rom a perspective that only an expert can have,

DEC found the exceedances on [Lighthouse's] property to be relatively small in number and minimal in magnitude. Without the benefit of the agency's expertise or perspective borne of experience, the courts lack any basis to substitute their own judgment for that of DEC."

Further, DEC contends, once it determined that no cleanup was warranted, redevelopment or reuse of the properties was, by force of this circumstance alone, not "complicated" within the meaning of the statutory definition.

Courts "regularly defer to the governmental agency charged with the responsibility for administration of [a] statute" in those cases where interpretation or application "involves knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom," and the agency's interpretation "is not irrational or unreasonable" (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980]). But where

"the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency and its interpretive regulations are therefore to be accorded much less weight. And, of course, if the regulation runs counter to the clear wording of a statutory provision, it should not be accorded any weight" (*id.*).

The meaning of the term "brownfield site" presents precisely such a "question . . . of pure statutory reading."

There are two constituents to the definition: the presence or potential presence of a contaminant on the real property; and this presence or potential presence must complicate the property's redevelopment or reuse. The term "contaminant" is defined in the statute (*see* ECL 27-1405 [7-a]). The word "present" is not, but in common English usage means "being in one place and not elsewhere: being within reach, sight, or call or within contemplated limits: being in view or at hand: being before, beside, with, or in the same place as someone or something" (Webster's Third New International Dictionary, Unabridged [Merriam-Webster 2002] [http://unabridged. merriam-webster.com (Feb. 7, 2010)]). Thus, a contaminant is present or potentially present on real property when it does or may exist or be found within the property's limits;

the statutory definition does not, on its face, mandate the presence of any particular level or degree of contamination. Finally, the word "complicate," also undefined in the statute, in common English usage means "to make complex, involved, or difficult" (Webster's Third New International Dictionary, Unabridged [Merriam-Webster, 2002] [http://unabridged. merriam-webster.com (Jan. 31, 2010)]). Accordingly, real property qualifies as a "brownfield site" for purposes of acceptance into the BCP so long as the presence or potential presence of a contaminant within its boundaries makes redevelopment or reuse more complex, involved, or difficult in some way.

This low eligibility threshold is consistent with the statute's legislative history. The BCP legislation essentially addresses the unforeseen consequences of the government's great success in imposing strict, joint and several liability for costly environmental cleanups on property owners; namely, this caused even marginally polluted property to become virtually unmarketable because of the chance that a cleanup of unknown dimension and expense might someday be required. Since there was great uncertainty about what remedial measures might satisfy environmental regulators, any property owner that unilaterally cleaned up contamination ran the risk that the government might, at a later time, consider the remedy implemented, perhaps at significant cost, to be inadequate. Under these circumstances, lenders were reluctant to finance development on property historically used for industrial or commercial purposes, which was or might be contaminated—as all such property was bound to be to some degree—because the value of their collateral might be threatened. As a result, former industrial and commercial properties languished, while development spread to unspoiled land.

With the BCP, the Legislature sought to alleviate these environmental and economic problems by providing a means for owners to gain DEC's approval when they cleaned up their property, and to encourage them to do so by offering a release from liability and financial incentives. Notably, the BCP replaced and was intended to improve upon the success of the VCP, which was apparently a program of self-nominated participants. This, too, is consistent with our conclusion that the Legislature intended the definition of the term "brownfield site" to be interpreted as broadly as its words suggest.

In this case, the properties are concededly contaminated with multiple contaminants, often exceeding generally accepted cleanliness levels (the SCOs), and other environmental standards or criteria. And the Inland Site has for years been included in the DEC's database of hazardous substance waste disposal sites. Further, Lighthouse has produced undisputed evidence demonstrating that the presence of contaminants at the properties has complicated redevelopment or reuse in several ways. First, the contamination at the Inland Site prevented the owner of the largest portion of it from developing a residential project; the MCDPH remains unwilling to sign off on any development at the Inland Site unless Lighthouse undertakes DEC-sanctioned remedial measures; and financing for redevelopment of the properties is contingent upon DEC's approval of Lighthouse's proposed investigatory and remedial measures and a release of liability.

We are mindful that DEC assures Lighthouse that the overall profile of contamination on the properties does not call for remedial action. But this does not relieve Lighthouse's plight. The properties are contaminated. Without a release of liability, neither Lighthouse nor its prospective lender can be confident that regulatory views about the necessity for or the adequacy of any self-directed cleanup will not change sometime down the line. Although we might reach a different conclusion about whether redevelopment or reuse has been complicated by the presence of contaminants if DEC backed up its representations to Lighthouse with a release of liability, this is apparently impossible absent Lighthouse's completion of a cleanup under DEC's auspices in the BCP.

Finally, we do not remit this matter to the Department for further consideration in light of our decision, the alternative relief requested by DEC. The record in this case was sufficiently developed for Supreme Court to conclude, as it did, that, as a matter of law, Lighthouse was eligible for acceptance into the BCP (see Matter of Pantelidis v New York City Bd. of Stds. & Appeals, 10 NY3d 846 [2008]; see also Matter of East Riv. Realty Co., LLC v New York State Dept. of Envtl. Conservation, 68 AD3d 564 [2009]; Matter of Destiny USA Dev., LLC v New York State Dept. of Envtl. Conservation, 63 AD3d 1568 [2009]).

Accordingly, the order of the Appellate Division should be reversed, with costs, and the judgment of Supreme Court reinstated. The certified question should not be answered on the ground that it is unnecessary.

Chief Judge Lippman and Judges Ciparick, Graffeo, Smith, Pigott and Jones concur.

Order reversed, etc.