[961 NE2d 657, 938 NYS2d 266]

In the Matter of NEW YORK STATE SUPERFUND COALITION, INC.,
Appellant, v NEW YORK STATE DEPARTMENT OF ENVIRONMEN-
TAL CONSERVATION et al., Respondents.

Argued November 14, 2011; decided December 15, 2011

**POINTS OF COUNSEL**

*Hiscock & Barclay, LLP*, Rochester (*Thomas F. Walsh, Thomas J. Warth* and *Danielle E. Mettler* of counsel), for appellant. I. The issue concerning the State Superfund program cleanup goal is of public importance. (*Matter of Flynn v State Ethics Commn., Dept. of State, State of N.Y.*, 87 NY2d 199; *Matter of Tze Chun Liao v New York State Banking Dept.*, 74 NY2d 505; *Finger Lakes Racing Assn. v New York State Racing & Wagering Bd.*, 45 NY2d 471; *Servomation Corp. v State Tax Commn.*, 51 NY2d 608; *Matter of Campagna v Shaffer*, 73 NY2d 237; *Matter of Consolidated Edison Co. of N.Y. v Department of Envtl. Conservation*, 71 NY2d 186; *Boreali v Axelrod*, 71 NY2d 1; *Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal*, 5 NY3d 303.) II. The Appellate Division erred in deferring to New York State Department of Environmental Conservation's interpretation of ECL 27-1313

(5) (d). (*Flacke v Onondaga Landfill Sys.*, 69 NY2d 355; *Matter of Chemical Specialties Mfrs. Assn. v Jorling*, 85 NY2d 382; *Matter of Binghamton-Johnson City Joint Sewage Bd. v New York State Dept. of Envtl. Conservation*, 159 AD2d 887; *Matter of Lighthouse Pointe Prop. Assoc. LLC v New York State Dept. of Envtl. Conservation*, 14 NY3d 161; *Matter of Tze Chun Liao v New York State Banking Dept.*, 74 NY2d 505; *Friedman v Connecticut Gen. Life Ins. Co.*, 9 NY3d 105.) III. Even if the Court determines that ECL 27-1313 (5) (d) is ambiguous, the legislative history compels a finding that the lower appellate court erred as a matter of law. (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451; *Matter of Lighthouse Pointe Prop. Assoc. LLC v New York State Dept. of Envtl. Conservation*, 14 NY3d 161; *Riccelli Enters., Inc. v New York State Dept. of Envtl. Conservation*, 30 Misc 3d 573; *Matter of Tze Chun Liao v New York State Banking Dept.*, 74 NY2d 505; *Matter of Campagna v Shaffer*, 73 NY2d 237; *Servomation Corp. v State Tax Commn.*, 51 NY2d 608; *Roberts v Tishman Speyer Props., L.P.*, 13 NY3d 270; *Flacke v Onondaga Landfill Sys.*, 69 NY2d 355; *Matter of Scanlan v Buffalo Pub. School Sys.*, 90 NY2d 662; *Matter of Cintron v Calogero*, 15 NY3d 347.)

*Eric T. Schneiderman, Attorney General*, Albany (*Andrew B. Ayers, Barbara D. Underwood* and *Denise A. Hartman* of counsel), for respondents. I. New York State Department of Environmental Conservation's regulations adopt the most reasonable interpretation of article 27, title 13 of ECL and give meaning to all of the relevant statutory language. (*Matter of DaimlerChrysler Corp. v Spitzer*, 7 NY3d 653; *Roberts v Tishman Speyer Props., L.P.*, 13 NY3d 270; *Dana v New York Cent. & Hudson Riv. R.R. Co.*, 92 NY 639; *Matter of Nicholas v Kahn*, 47 NY2d 24; *Matter of Golf v New York State Dept. of Social Servs.*, 91 NY2d 656; *Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib.*, 2 NY3d 249; *Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451; *Matter of Lighthouse Pointe Prop. Assoc. LLC v New York State Dept. of Envtl. Conservation*, 14 NY3d 161; *United States v Mead Corp.*, 533 US 218; *Chevron U.S.A. Inc. v Natural Resources Defense Council, Inc.*, 467 US 837.) II. The Legislature acquiesced in New York State Department of Environmental Conservation's interpretation of the goals of remedial programs. (*Brooklyn Union Gas Co. v New York State Human Rights Appeal Bd.*, 41 NY2d 84; *Matter of Oswald N.*, 87 NY2d 98; *Clark v Cuomo*, 66 NY2d 185.)

JONES, J.

Petitioner New York State Superfund Coalition, Inc. (Superfund Coalition) commenced this combined CPLR article 78 proceeding and declaratory judgment action to challenge certain regulations promulgated by the New York State Department of Environmental Conservation (DEC or the Department) with respect to remedial programs implemented to clean "inactive hazardous waste disposal sites."[1] The Superfund Coalition asserts that the regulations are ultra vires and impermissibly allow DEC to order expansive remedial programs that contravene the limited legislative goal of article 27, title 13 of the Environmental Conservation Law to identify and remove only "significant threats." We hold that DEC did not exceed its authority or act contrary to law in enacting the subject regulations.

I

In 1979, the Legislature enacted article 27, title 13 of the Environmental Conservation Law to address the public issue of inactive hazardous waste disposal sites. At the time of the enactment, DEC had identified approximately 530 sites throughout the state that posed a threat to public health and the environment given their "proximity to densely populated areas or . . . water courses or aquifers" (Budget Rep on Bills, at 2, Bill Jacket, L 1979, ch 282). At the time, inactive hazardous waste disposal sites were largely unregulated, as opposed to active waste disposal sites which were monitored under state and federal systems of regulation (see id.). As inactive sites were essentially unmonitored, there was no standard practice of ensuring adequate disposal or containment of hazards to minimize environmental impacts (see id.). The 1979 enactment was proposed to place the burden of remedying these sites on those responsible for the presence of waste material, or in the alternative, task DEC with implementing a remedial program in the

---

1. "Inactive hazardous waste disposal site means any area or structure used for the long term storage or final placement of hazardous waste including, but not limited to, dumps, landfills, lagoons and artificial treatment ponds, as to which area or structure no permit or authorization issued by the department or a federal agency for the disposal of hazardous waste was in effect after the effective date of this title and any inactive area or structure on the National Priorities List established under the authority of 42 U.S.C.A. Section 9605" (ECL 27-1301 [2]).

event the responsible party was unknown, unable or unwilling to ameliorate the situation.

The Superfund Coalition is a not-for-profit corporation whose members consist of commercial entities that own land within the State of New York listed on a registry of sites subject to Department regulation. Previously, in *Matter of New York State Superfund Coalition v New York State Dept. of Envtl. Conservation* (75 NY2d 88 [1989]), the Superfund Coalition asked this Court to address DEC regulations regarding the identification of "inactive hazardous waste disposal sites" requiring remedial action (*see* ECL 27-1303, 27-1313 [3]). In that case, this Court annulled the regulation, concluding that DEC had acted beyond its authority by enacting overreaching regulations that conflicted with the statutory scheme of the Legislature. While the Legislature had envisioned the utilization of a "significant threat" standard in the identification of inactive hazardous waste disposal sites—which contemplated the existence of an actual threat, or "more than the mere presence of hazardous waste" (75 NY2d at 93)—the corresponding regulation permitted the Department to identify waste sites based on the potential existence of hazardous waste (*see id.* at 93-94). This Court observed that, as constructed, "the DEC regulation would allow remedial programs to be ordered for *all* inactive hazardous waste disposal sites, not just those which pose a significant threat as targeted by the Legislature" (*id.* at 94 [internal quotation marks omitted]).

In this appeal, the Superfund Coalition now challenges regulations concerning the nature and breadth of remedial programs implemented to clean inactive hazardous waste disposal sites following their identification under the "significant threat" standard set forth by the Legislature. It commenced a combined CPLR article 78 proceeding and declaratory judgment action to challenge and annul regulations 6 NYCRR 375-2.8 (a), 6 NYCRR 375-1.8 (f) (9) (i), 6 NYCRR 375-2.2 (i) (7) and 6 NYCRR 375-1.8 (g) (5) on grounds that their adoption was in excess of the DEC's jurisdiction, and arbitrary and capricious.

Supreme Court granted the petition in part, invalidating 6 NYCRR 375-2.8 (a) and 6 NYCRR 375-1.8 (f) (9) (i) as null and void.[2] The court reasoned that

"ECL 27-1313(5)(d) authorizes a complete cleanup

---

2. Supreme Court also annulled 6 NYCRR 375-2.2 (i) (7), but that regulation is not at issue on this appeal.

to the extent of the elimination of the significant threat and of the imminent danger of irreversible or irreparable damage to the environment. Had the Legislature wished to return every inactive hazardous waste site to predisposal conditions, it could have stopped at a complete cleanup. But it did not . . . In ignoring the statutory definitions and goals, the revised regulation is an unlawful continuation by the DEC to equate hazardous waste with significant threat, in that a return to predisposal conditions necessitates removal of all hazardous wastes, whereas the statute requires only the elimination of the significant threat and of the imminent danger of irreversible or irreparable damage to the environment" (internal quotation marks and citation omitted).

The Appellate Division unanimously modified by reversing the portion of Supreme Court's order that annulled the two regulations (68 AD3d 1588 [3d Dept 2009]). The court, finding ambiguity in the language of section 27-1313 (5), deferred to DEC's interpretation and concluded that "the regulatory goal is consistent with the statutory definition of inactive hazardous waste disposal site remedial program, which is broad enough to allow the employment of a wide range of methods and may address even potential hazards once DEC has made the threshold determination that remediation is necessary" (68 AD3d at 1590 [internal quotation marks and citation omitted]). This Court granted the Superfund Coalition leave to appeal (15 NY3d 712 [2010]).

The issue before this Court is whether regulations 6 NYCRR 375-2.8 (a) and 6 NYCRR 375-1.8 (f) (9) (i), which call for the restoration of inactive hazardous waste disposal sites to "predisposal conditions, to the extent feasible" exceed the enabling authority of Environmental Conservation Law § 27-1313 (5) (d) which provides, in pertinent part, that the goal of a remedial program is "a complete cleanup of the site through the elimination of the significant threat to the environment posed by the disposal of hazardous wastes at the site." We hold that they do not, and now affirm.

## II

It is axiomatic that "an agency's authority must coincide with its enabling statute" (*Matter of New York State Superfund Coalition*, 75 NY2d at 92).

"Administrative agencies, as creatures of the Legislature within the executive branch, can act only to implement their charter as it is written and as given to them. An agency cannot create rules, through its own interstitial declaration, that were not contemplated or authorized by the Legislature and thus, in effect, empower themselves to rewrite or add substantially to the administrative charter itself" (*Matter of Tze Chun Liao v New York State Banking Dept.*, 74 NY2d 505, 510 [1989] [citations omitted]).

That is, we must consider whether the subject regulations have a statutory basis or represent an impermissibly broad exercise of authority by DEC, expanding the power conferred upon it by the Legislature.

Environmental Conservation Law § 27-1313 (5) (d) provides, as relevant here, that

"[t]he goal of any such remedial program shall be a complete cleanup of the site through the elimination of the significant threat to the environment posed by the disposal of hazardous wastes at the site and of the imminent danger of irreversible or irreparable damage to the environment caused by such disposal."

6 NYCRR 375-2.8 (a), in turn, provides that

"[t]he goal of the remedial program for a specific site is to restore that site to pre-disposal conditions, to the extent feasible. At a minimum, the remedy selected shall eliminate or mitigate all significant threats to the public health and to the environment presented by contaminants disposed at the site."

And 6 NYCRR 375-1.8 (f) (9) (i), which incorporates the remedial goal stated in 6 NYCRR 375-2.8 (a) into the consideration of land use when implementing a remedial program provides that

"[i]n assessing reasonable certainty [of land use], the Department shall consider:

"(i) the current, intended, and reasonably anticipated future land uses of the site and its surroundings in the selection of the remedy for soil remediation under the brownfield cleanup and

environmental restoration programs, and may consider land use in the State superfund program, where cleanup to pre-disposal conditions is determined not feasible."

"Courts regularly defer to the governmental agency charged with the responsibility for administration of [a] statute in those cases where interpretation or application involves knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom, and the agency's interpretation is not irrational or unreasonable" (*Matter of Lighthouse Pointe Prop. Assoc. LLC v New York State Dept. of Envtl. Conservation*, 14 NY3d 161, 176 [2010] [internal quotation marks omitted]; *Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980]).

However, if

"the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency and its interpretive regulations are therefore to be accorded much less weight. And, of course, if the regulation runs counter to the clear wording of a statutory provision, it should not be accorded any weight" (*Matter of Lighthouse Pointe*, 14 NY3d at 176).

The Superfund Coalition argues—and the dissent agrees—that a plain reading of section 27-1313 (5) (d) indicates that a "complete cleanup" is effectuated solely through "the elimination of the significant threat to the environment." In our view, though, this is a strained reading of a statute that on its face tasks the Department with eliminating significant threats while also stating a preference for a more thorough or "complete" cleanup. This reading is consistent with the well-settled rule of statutory construction that "effect and meaning must, if possible, be given to the entire statute and every part and word thereof" (McKinney's Cons Laws of NY, Book 1, Statutes § 98; *Sanders v Winship*, 57 NY2d 391, 396 [1982]).

As an initial matter, we note that section 27-1313 (5) (d), in fact, addresses only those situations where DEC has determined that it is "cost-effective" for the Department itself to develop

and implement a remedial program at a site. Put another way, this provision—unlike 6 NYCRR 375-2.8 (a) and 6 NYCRR 375-1.8 (f) (9) (i)—does not apply where, for example, DEC orders a responsible party to implement a remedial program (*see* ECL 27-1313 [3]); or undertakes a remedial program itself because a responsible party is unwilling or unable to do so, or DEC is unable to timely identify a responsible party (ECL 27-1313 [5] [a], [b], [c]). Notably, the factors to be considered by the Department in determining whether it is "cost-effective" for it to act under ECL 27-1313 (5) (d) in the first place include "the ability of the department to determine, through the exercise of its scientific judgment, whether the elimination of the imminent danger of irreversible or irreparable damage to the environment" posed by the significant threat "can be achieved through *limited actions*"; and "the extent to which" remedial action undertaken by DEC "would *reduce* such danger to human health or the environment or would otherwise benefit human health or the environment" (ECL 27-1313 [5] [d] [i], [iv] [emphases added]). These factors support our view that the stated goal of a "complete" cleanup under section 27-1313 (5) (d) is aspirational since the statute recognizes that DEC may implement limited actions that reduce rather than completely eliminate dangers.

Our construction of the statute is also consistent with section 27-1301 (3), which defines inactive hazardous waste disposal site remedial programs as including "activities undertaken to eliminate, remove, *abate, control* or monitor health and/or environmental hazards or *potential hazards* in connection with inactive hazardous waste disposal sites" (ECL 27-1301 [3] [emphases added]). The Legislature's express definition of a remedial program, which includes measures of abatement or control in addition to elimination and removal and refers to potential hazards, likewise evinces a preference for the most thorough cleanup that makes sense in light of technical feasibility and cost-effectiveness. Although the Superfund Coalition fears that the regulatory goal for a remedial program of "predisposal conditions, to the extent feasible," if left in place, would require removal of "every last molecule" of contamination or cleanup to "pre-Columbian environmental quality," DEC disavows any such intention. Indeed, as the Department points out, technical feasibility and cost-effectiveness bear importantly on remedy selection, as the regulations recognize. For example, a feasibility study may allow a responsible party to prepare a site for a "restricted use" (6 NYCRR 375-2.8 [c]; *see also* ECL

27-1317 [discussing remedial work plans calling for institutional and engineering controls]).

Thus, while the cleanup of an inactive hazardous waste disposal site is triggered by a finding of a "significant threat," as discussed in the prior *Matter of New York State Superfund Coalition* (75 NY2d 88 [1989]) case, that standard does not limit the scope of the ensuing remedial program when a more thorough cleanup is justified. The direction to clean up to "predisposal conditions, *to the extent feasible*" (6 NYCRR 375-2.8 [a] [emphasis added]) is a shorthand way of saying the same thing and so accords with the aims of article 27, title 13 and the statutory language.

Finally, we note that although the Superfund Coalition refers to DEC's adoption of the cleanup goal of "pre-disposal conditions, to the extent feasible" as marking a "sea change" in remedy selection, it is not new. The same language has been in DEC's regulations since 1992. As originally adopted, the regulation stated that the goal of a remedial program was to restore a site to pre-disposal conditions "to the extent feasible *and authorized by law*" (former 6 NYCRR 375-1.10 [b] [emphasis added]). DEC simply eliminated the phrase "and authorized by law" as surplusage when amending the regulation in 2006. We agree with DEC and the Appellate Division that the omission of the phrase "and authorized by law" makes no substantive change to the cleanup goal.

In sum, there is no discernible difference between the use of the phrase "complete cleanup" in section 27-1313 (5) (d) and "pre-disposal conditions, to the extent feasible" in DEC's regulations. A remedial program may encompass measures that run a gamut from removal of wastes to institutional controls, implemented to address harms that range from potential to actual hazards. Contrary to the Superfund Coalition's contention that a standard of "pre-disposal conditions, to the extent feasible" would compel a reversion to pristine environmental conditions, there is no statutory authority, or indication in the regulations that DEC is empowered to arbitrarily fashion a remedial program.

## III

Although a remedial program may address a greater number of environmental hazard concerns, the authority of DEC to order remedial programs is not unfettered, as previously indicated. As the Department itself recognizes in its regulations, remedial

programs are limited "to the extent feasible" as any remediation would be subject to a number of factors that must be considered in shaping the goals and scope of a program, prior to its implementation.

"In determining the scope, nature and content of such [remedial] program, the department shall consider among others, the following factors:

"(i) the technological feasibility of all actions;

"(ii) the nature of the danger to human health and the environment which the actions are designed to address; and

"(iii) the extent to which the actions would reduce such danger to human health or the environment or would otherwise benefit human health or the environment" (ECL 27-1313 [5] [c]).

Consequently, DEC is not empowered to unilaterally fashion a remedial program without due consideration of the practicalities of such a measure as the statutory scheme expressly ties the scope of such programs to the particular characteristics for each regulated site. Accordingly, the phrase "to the extent feasible" in the DEC regulation is a reasonable incorporation of the considerations within the statute and a limit on the scope of remedial programs.

Further, the Department cannot arbitrarily exercise its authority as the Legislature has provided for a specific process prior to the implementation of any remedial program by which landowners subject to DEC regulation may contest the order of such a measure. First, the issuance of an order directing a remedial program must provide "notice and the opportunity for a hearing" to persons subject to such an order (ECL 27-1313 [4]). Second, any person subject to such an order is entitled to present a defense or comment on the matter. Third, no order shall be issued until a final determination is rendered by the commissioner subsequent to a hearing. Finally, a person subject to an order may challenge it through a CPLR article 78 proceeding within 30 days after the service of an order (see id.).

## IV

Pursuant to the statutory scheme of article 27, title 13 of the Environmental Conservation Law, DEC is authorized to identify inactive hazardous waste disposal sites under the "significant

threat" standard—i.e., the existence of actual waste on the site. If an actual significant threat is not present, then the site is not subject to remediation. However, if a significant threat has been found and remediation deemed necessary, an appropriately tailored program can be implemented to encompass dangers ranging from potential harms to actual, significant threats as the Legislature has separately defined "remedial program" to permit it to address other harms (ECL 27-1301 [3]). Ultimately, these administrative directives can be constrained by technological feasibility, cost-effectiveness and procedural due process, among other things. Consequently, the challenged DEC regulations, which mirror this statutory scheme, are reasonable interpretations that incorporate the essential goals of the statutes and do not exceed the enabling authority of the legislation with respect to the cleanup of inactive hazardous waste sites (cf. *Matter of Tze Chun Liao*, 74 NY2d at 510-511).

Accordingly, the order of the Appellate Division should be affirmed, with costs.

PIGOTT, J. (dissenting). Over 20 years ago, we held that ECL 27-1301 (1) (b) and 27-1313 (3) require the Department of Environmental Conservation (DEC) to demonstrate that hazardous waste constitutes a "significant threat" to the environment before ordering the implementation and development of an "inactive hazardous waste disposal site remedial program," nullifying a DEC regulation that allowed the DEC to render a "significant threat" determination premised only on the mere presence of hazardous waste on the site (*Matter of New York State Superfund Coalition v New York State Dept. of Envtl. Conservation*, 75 NY2d 88, 93 [1989]). On this appeal, we address a corollary issue, namely, the breadth of the DEC's remedial program once the DEC determines that the hazardous waste constitutes a "significant threat" to the environment. Because in my view the regulations in question here exceed the unambiguous directive of ECL 27-1313 (5) (d), I respectfully dissent.

ECL 27-1313 (5) (d) states, in relevant part, that

"the department shall be authorized to develop and implement an inactive hazardous waste disposal site remedial program at the site pursuant to this subdivision if, in the discretion of the department, it is cost-effective for the department to develop and implement such a remedial program. *The goal of*

*any such remedial program shall be a complete
cleanup of the site through the elimination of the
significant threat to the environment* posed by the
disposal of hazardous wastes at the site and of the
imminent danger of irreversible or irreparable dam-
age to the environment caused by such disposal"
(emphasis supplied).

Pursuant to this statute, the DEC promulgated 6 NYCRR 375-
2.8 (a), which states that

*"[t]he goal of the remedial program for a specific
site is to restore that site to pre-disposal conditions,*
to the extent feasible" and that, *"[a]t a minimum,*
the remedy selected shall eliminate or mitigate all
significant threats to the public health and to the
environment presented by contaminants disposed at
the site" (emphasis supplied).[1]

There is nothing ambiguous about ECL 27-1313 (5). (d): the
objective of the remedial program is "complete cleanup" of the
site, which is met "through the elimination of the significant
threat." Had the Legislature intended to grant the DEC author-
ity to order a "complete cleanup" in the broad manner that the
majority claims, then there would have been no need for the
inclusion of the limiting clause "through the elimination of the
significant threat." But it is clear from the statutory language
that the Legislature intended to limit the reach of the remedial
program to the "elimination of the significant threat."
Therefore, 6 NYCRR 375-2.8 (a)'s directive that the remedial
program's goal is to achieve "pre-disposal conditions" not only
directly contradicts its enabling statute, thereby entitling the
DEC's "interpretation" of ECL 27-1313 (5) (b) to no weight (*see
Matter of Lighthouse Pointe Prop. Assoc. LLC v New York State
Dept. of Envtl. Conservation,* 14 NY3d 161, 176 [2010]), but it
also exceeds the powers the Legislature granted to the DEC
through ECL 27-1313 (5) (d)'s enactment (*see Matter of Tze
Chun Liao v New York State Banking Dept.,* 74 NY2d 505, 510
[1989]).

The cost-effectiveness factors set forth at ECL 27-1313 (5) (d)
(i) and (iv) lend no support to the majority's conclusion that a
"complete cleanup," as they define it, is merely aspirational;
the "limited actions" referenced by the majority underscore the

---

1. The other challenged regulation, 6 NYCRR 375-1.8 (f) (9) (i), incorpo-
rates the term "pre-disposal conditions."

Legislature's intent that a "complete cleanup" is limited to the elimination of the significant threat. For instance, the first cost-effectiveness factor—a scientific determination of "whether the elimination of the imminent danger of irreversible or irreparable damage to the environment can be achieved through *limited actions*" (ECL 27-1313 [5] [d] [i] [emphasis supplied])—relates back to ECL 27-1313 (5) (d)'s definition of what conditions pose a "significant threat to the environment," namely, the "disposal of hazardous wastes" *and* the "imminent danger . . . caused by such disposal." In other words, the Legislature directed the DEC to conduct a scientific analysis to assess whether the elimination of the significant threat could be achieved with "limited actions," not, as the majority appears to claim, whether all "insignificant threats" (i.e., those hazardous wastes that do not pose an "imminent danger of irreversible or irreparable damage to the environment") can be removed. Moreover, the second cost-effectiveness factor cited by the majority—consideration of "the extent to which the actions would reduce such danger to human health or the environment or would otherwise benefit human health or the environment"—cannot be viewed in a vacuum (ECL 27-1313 [5] [d] [iv]). This cost-effectiveness factor, like ECL 27-1313 (5) (d) (i), is one the DEC must take into account in determining whether it would be cost-effective for it to develop an inactive hazardous waste disposal remedial program at the site to *eliminate the significant threat*, and cannot be interpreted as legislative approval for the institution of a DEC remedial program that extends beyond that objective.

The majority places undue significance on the fact that ECL 27-1301 (3)'s definition of "inactive hazardous waste disposal site remedial program"[2] includes the remediation of "potential hazards" (majority op at 297), as if this demonstrates a legislative intent that such a program may go beyond the elimination of the significant threat. Rather, the broad definition merely

---

2. An "inactive hazardous waste disposal site remedial program" is defined, as

"activities undertaken to eliminate, remove, abate, control or monitor health and/or environmental hazards or potential hazards in connection with inactive hazardous waste disposal sites or to treat or dispose of wastes and waste contaminated materials from such sites including, but not limited to, grading, contouring, trenching, grouting, capping, excavation, transporting, incineration, chemical treatment, biological treatment or construction of leachate collection and treatment facilities."

delineates the tools the DEC may use as part of its remedial program; it is not demonstrative of any legislative intent to grant the DEC authority to contravene ECL 27-1313 (5) (d) by allowing it to restore a site to pre-disposal conditions. Indeed, the DEC's definition of "significant threat" allows the Commissioner to identify potential hazards as a significant threat if "the Commissioner determines that the contaminants disposed at the site or coming from the site result in, *or are reasonably foreseeable to result in*" any of the "significant adverse impact[s]" or "effects" set forth in 6 NYCRR 375-2.7 (a) (1) (i)-(vi) or "significant environmental damage" (6 NYCRR 375-2.7 [a] [1], [2] [emphasis supplied]). Given the DEC's interpretation that a "significant threat" can encompass potential hazards, i.e., those that are "reasonably foreseeable to result in" certain designated harms, it can hardly be said that the Legislature's inclusion of the phrase "potential hazards" in ECL 27-1301 (3) was meant to apply to remediation of those wastes that do not pose a "significant threat" to the environment.

Finally, the majority tries to temper its expansive interpretation of ECL 27-1313 (5) (d) and 27-1301 (3) by pointing to 6 NYCRR 375-2.8 (a)'s language that the goal of any remedial program is to restore the site to its pre-disposal condition "to the extent feasible" (majority op at 298). This amorphous language, however, lends little comfort and certainty to actual and prospective owners of such sites, as it is the DEC, and the DEC alone, that will make the determination as to how extensively a site must be remediated and how much money the property owner must expend to return the site to "pre-disposal conditions," whatever that means. Moreover, DEC's interpretation of ECL 27-1313 (5) (d) goes beyond what any competent Legislature would permit, and these regulations, as upheld by the majority, codify a questionable policy of imposing upon private landowners the financial burden of eliminating *insignificant* threats to the environment which, in my view, is hardly a goal that justifies compelling private citizens to expend large sums of money. Had the Legislature intended such a draconian result, it would not have so clearly stated that a "complete cleanup" is one that is achieved "through the elimination of the significant threat," a directive that, until now, was one that could be easily followed and provided landowners and prospective landowners alike with certainty as to the cost of remediation. Therefore, I would reverse the order of the Appellate Division and grant the petition.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO and READ concur with Judge JONES; Judge PIGOTT dissents and votes to reverse in a separate opinion in which Judge SMITH concurs.

Order affirmed, with costs.