WILSON, J.
***335 The Appellate Division held that neither title 9 nor title 13 of article 27 of the Environmental Conservation Law authorized respondent Department of Environmental Conservation (DEC) to unilaterally remediate the significant threat posed by hazardous wastes petitioner FMC Corporation (FMC) had released onto neighboring properties. We conclude that the Appellate Division erred in foreclosing the possibility that title 9 authorized DEC's *381 **913 unilateral action and that the interpretation of title 13 adopted by both parties authorized DEC's unilateral remediation effort. We therefore reverse the Appellate Division's order and dismiss FMC's CPLR article 78 petition.
I. Background
FMC owns and operates a 103-acre pesticide production facility in Niagara County. Over nearly a century of operation, that facility has released significant quantities of hazardous wastes including arsenic, lead, cyanide, acetone, DDT, and carbofuran. Many of those wastes have migrated onto adjacent properties including a school, recreational watercourses, croplands, and several hundred residences. FMC continues to store hazardous wastes and to formulate pesticides on the site.
DEC's substantial involvement with the facility dates back to 1980 and proceeds under two separate titles of article 27 of the Environmental Conservation Law. In that year, FMC initiated a permit application process with DEC and the U.S. Environmental Protection Agency (EPA) under title 9, which regulates the active generation, storage, and disposal of hazardous ***336 wastes and under its federal counterpart, the Resource Conservation and Recovery Act ( 42 USC § 6901 et seq. [RCRA] ). Thirty-eight years later, that process has not yet resulted in a permit; instead, the facility has operated all that time on interim status. Also in 1980, DEC listed a portion of the facility on the New York Registry of inactive hazardous waste sites under title 13, which regulates those inactive sites. DEC later substantially expanded the boundaries of the Registry listing and classified the facility as one posing a "[s]ignificant threat to the public health or environment-action required" ( ECL § 27-1305[2][b][2] ).
The title 9 permitting process requires applicants to undertake corrective actions for all releases of hazardous waste ( ECL § 27-0913 ). As part of that process, FMC entered into a 1991 consent order with DEC and the EPA that required it to undertake a variety of obligations, including the preparation of a corrective measures study. The 1991 order did not require FMC to undertake a particular corrective measure. Instead, it contemplated that the EPA, which later delegated its authority to DEC, would use the study prepared by FMC to help inform its selection of a final corrective measure. In 2013, DEC adopted a final corrective measure- CMA 9 -in a lengthy Final Statement of Basis laying out the reasons for its decision. CMA 9 applies to three parcels of properties adjacent to the FMC facility: a schoolyard, a culvert, and a residential neighborhood. FMC, in its corrective measures study, proposed eight different options for remediation, labelled CMAs 1 through 8. DEC found that none of FMC's proposals sufficiently ameliorated the threat posed by FMC's releases of hazardous wastes, and created CMA 9 by combining CMAs 2 and 8. For the following year, DEC attempted to negotiate a new consent order obligating FMC to implement CMA 9. When those negotiations failed, DEC announced it would undertake the corrective measure itself and seek to recover its associated expenses from FMC after the fact. FMC filed this article 78 petition contesting DEC's decision.
In its petition, FMC asserted four causes of action. The first two, which the Appellate Division rejected, made essentially procedural objections to DEC's Statement of Basis, claiming it should have been promulgated pursuant to the federal Resource Conservation and Recovery Act instead of the New York Environmental Conservation Law and that DEC had denied FMC recourse to the dispute resolution mechanisms contained ***337 in the *382 **914 1991 order. The fourth, which the Appellate Division did not reach, alleged that DEC's selection of CMA 9 instead of any of the eight alternatives FMC had suggested was arbitrary and capricious. FMC does not pursue any of those causes of action here.
FMC's arguments are limited to its third cause of action, which alleges that that DEC's decision to implement CMA 9 unilaterally, rather than through FMC, was arbitrary and capricious. The Appellate Division, after reversing Supreme Court's order dismissing the petition as untimely, held that DEC's decision to implement CMA 9 itself was arbitrary and capricious, and granted FMC's petition on that basis ( Matter of FMC Corp. v. NYS DEC, 143 A.D.3d 1128, 1135, 40 N.Y.S.3d 220 [3rd Dept. 2016] ). It later granted DEC's motion for permission to appeal to this Court ( Matter of FMC Corp. v. NYS DEC, 2017 WL 509845 [3d Dept. 2017] ).
II. Discussion
The parties agree that DEC had several options through which it could have sought an order requiring FMC to undertake CMA 9 (see e.g. ECL § 27-1313[3][a] ; id. § 71-2727). They also agree that those options would have provided FMC with the opportunity for a hearing prior to the implementation of that corrective measure, whereas DEC's decision to conduct the remediation itself left FMC with only two avenues for challenging DEC's decision: this CPLR article 78 proceeding and any cost recovery action DEC may bring under our Environmental Conservation Law or the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (see ECL §§ 71-2705 et seq. ; id. § 71-2723; 42 U.S.C. § 9607 [a][4][A] ). Finally, they agree that there are circumstances under which titles 9 and 13 authorize DEC to undertake the corrective measure itself, without first providing FMC-which is not being ordered to take any action or to suffer any activity on its property-with the opportunity for a hearing. This case turns on whether either of those circumstances is present.
A. Title 9
Title 9 regulates hazardous wastes "now being generated and sites now being used for disposal of such wastes" (L 1979 c 282 § 1). It requires any person generating, transporting, treating, storing, or disposing of hazardous wastes to obtain a ***338 permit to do so ( ECL § 27-0913[1][a] ). Although new facilities are required to obtain permits before commencing operation, certain legacy operators doing business at the time of the title's effective date can continue operating during a period of interim status pending the final disposition of their permit applications ( id. § 27-0913[1][b] ; 6 NYCRR 373-1.3 ). Interim status "is a temporary measure designed to phase existing facilities into compliance with permit requirements'' ( 6 NYCRR 373-1.3 [a] ). As such, it is "conditioned upon compliance with performance standards" set forth at length in 6 NYCRR 373-3.1 through 3.31 and may be "modified, suspended or revoked in a manner similar to a permit" (id. ). However, it "shall not be deemed to be a permit" ( ECL § 27-0913 [1 ][b] ). Permittees and prospective permittees, including those operating under interim status, may be ordered to undertake "corrective action, including corrective action beyond the facility boundary where necessary to protect human health and the environment, for all releases of hazardous waste" ( id. § 27-0913 [1 ]; see id. § 71-2727 [3] ).
The permitting scheme is augmented by DEC's authority to seek substantial civil and criminal penalties against violators and by its having the funds and flexibility required to clean up violations. Section *383 **915 27-0914 prohibits "possess[ing] ... dispos[ing] of ... [or] deal[ing] in hazardous wastes without authorization." Title 71 contains the penalties for doing so, which can include fines and damages payable to the state superfund (id. § 71-2705; id. § 71-2723). Section 27-0916 authorizes DEC to use that superfund "to clean up or return to its original state any area where hazardous wastes were disposed, possessed or dealt in unlawfully in violation of section 27-0914." Nothing in the Environmental Conservation Law or the superfund statute requires DEC to defer its own use of superfund money to clean up a hazardous waste site until it has first ordered a violator of title 9 to take corrective action or provided that violator with a hearing. All DEC must do to unilaterally remediate a site, and to use superfund monies to do so, is determine that section 27-0914's terms were violated.
Here, DEC maintains that it was authorized to undertake CMA 9 because FMC had unlawfully disposed of hazardous waste, including through a number of releases between 1980 and the present. The Appellate Division disagreed. Instead, it held, FMC was "operating lawfully pursuant to its 'interim status' " "at all relevant times" ( FMC Corp., 143 A.D.3d at 1134, 40 N.Y.S.3d 220 ).
The conclusion that an entity with a permit or permission to operate under interim status cannot, as a matter of law, ***339 violate section 27-0914 was error. That section prohibits possessing, disposing of, or dealing in hazardous wastes "without authorization." "Authorization" means "the possession... of a valid license, permit or certificate ... or an order issued by the commissioner ... regarding the possession or release of hazardous... wastes ... or otherwise engaging in conduct which is exempt under applicable statutes, rules or regulations from the requirements of possessing such a license, permit, certificate or order" ( ECL § 71-2702[3] ).[1] Although the Appellate Division understood the mere possession of a permit or its analog to authorize behavior of any kind, the more natural understanding is that the possession of a permit authorizes a person to possess, dispose of, or deal in hazardous wastes only in accordance with the terms of that permit. That interpretation is supported by the legislative history, including by a memorandum from DEC (one of title 9's principal drafters) that describes the law as defining "authorization" to mean not merely possessing a permit, but "acting pursuant to permit authority" (Bill Jacket, L 1981 c 719 at 26). In contrast, the Appellate Division's interpretation would-for instance-allow an operator who had a permit to transport hazardous wastes to a treatment facility but chose to instead dump those wastes into a stream or field to escape being convicted under section 27-0914 and thus bearing the costs of remediation under section 71-2723; prevent DEC from remediating violations, however imminently dangerous, caused by a permittee who willfully contravened the terms of its permit and refused to perform the cleanup itself; and, when applied to several of article 71's felony provisions, which share a definition of "authorization" with section 27-0914, free permittees to deal unlawfully in hazardous wastes (see e.g. ECL § 71-2717 ). The only reasonable interpretation consistent with the statutory scheme and legislative purpose is that permittees and prospective permittees who *384 **916 exceed the terms of their permit or violate the performance standards required of those operating under interim status violate section 27-0914.
Although FMC's interim status did not provide it a safe harbor, a reversal of the Appellate Division on that point would ***340 merely present the central question: did DEC demonstrate a basis for finding that FMC released hazardous wastes in violation of section 27-0914? Perhaps recognizing the fragility of the Appellate Division's interpretation, FMC now argues that sections 27-0914 and 27-0916, which were enacted in 1981, apply only prospectively.[2] In addition to that legal dispute over at what point disposals became unlawful under section 27-0914, there is a dispute as to what if any hazardous wastes contaminated the relevant properties after that point. The resolution of those disputes governs not only whether DEC may act, but also to what extent; under title 9, DEC is authorized to return areas only to "the reasonably ascertainable condition of the property immediately prior to the unlawful act or if impracticable to determine such condition ... to a reasonably sound environmental condition" (id. § 27-0916 [1] ).
Were title 9 DEC's only avenue of recourse, those disputes would have to be resolved. However, it is usually not our function to evaluate the sufficiency of such evidence in the first instance. Here, DEC also relied upon title 13, to which we now turn.
B. Title 13
Unlike title 9, which regulates working industrial facilities, title 13 concerns inactive hazardous waste disposal sites. Remedial programs-title 13's equivalent to title 9's corrective actions-at those sites are governed by section 27-1313. That section authorizes DEC to order the owners, operators, or other parties responsible for an inactive hazardous waste disposal ***341 site constituting a significant threat to the environment to design and implement a DEC-approved remedial program ( ECL § 27-1313[3][a] ). FMC is such an owner/operator. Orders may be issued only after parties who may be subject to them are afforded notice and an opportunity for a hearing ( id. § 27-1313 [4 ] ).
Although the section evidences the legislature's preference for using a post-hearing order to "place the burden of remedying these sites on those responsible for the presence of waste material," it also authorizes DEC to develop and implement remedial programs "in the event the responsible party [is] unknown, unable or unwilling to ameliorate the situation" ( New York State Superfund Coal., Inc. v. NYS DEC, 18 N.Y.3d 289, 292-93, 938 N.Y.S.2d 266, 961 N.E.2d 657 [2011] ). In its petition and throughout the course of this *385 **917 litigation, FMC reads the section to describe four independent circumstances in which unilateral agency action would be appropriate:(a) "whenever a person ordered to eliminate a threat to the environment ... has failed to do so within the time limits specified in the order"; (b) "in the event that the commissioner ... is either unable to determine who may be responsible, or is unable to locate a person who may be responsible"; (c) "whenever the commissioner has made findings [of imminent danger] pursuant to [paragraph (3)(b) ]"; and (d) "if, in the discretion of the department, it is cost-effective for the department to develop and implement such a remedial program" ( ECL § 27-1313[5][a]-[d] ).[3] In other words, FMC contends, and DEC agrees, that subdivision (5)(d) authorizes unilateral action in every case where DEC determines that action is cost-effective. Because both parties adopt that view of the statute, we have no occasion to consider the propriety of their interpretation (cf. 6 NYCRR 375-2.11 [c][1][i][c] ). Under the parties' interpretation of ECL § 27-1313(5)(d), ***342 DEC was authorized to implement CMA 9 itself, without first ordering FMC to do so or providing a hearing. "[I]t is settled that in a proceeding seeking judicial review of administrative action, the court ... must ascertain only whether there is a rational basis for the decision or whether it is arbitrary and capricious" ( Flacke v. Onondaga Landfill Sys., Inc., 69 N.Y.2d 355, 363, 514 N.Y.S.2d 689, 507 N.E.2d 282 [1987] ). Although agencies are sometimes required to state that basis, subdivision (5)(d) not only entrusts cost-effectiveness determinations to the "discretion of the [D]epartment" but also declines-unlike other paragraphs of the same section-to require DEC to substantiate its findings in writing ( ECL § 27-1313 [5 ][d]; cf. id. § 27-1313[3][b] ).
DEC's cost-effectiveness determination can be broken into two analytically separate pieces: the choice of CMA 9 and the choice to proceed unilaterally. FMC no longer contests that DEC's Final Statement of Basis demonstrated CMA 9 was a cost-effective alternative to CMAs 1 through 8.
Thus, the sole outstanding question is whether DEC determined that unilaterally implementing CMA 9 was a cost-effective alternative to ordering FMC to proceed. FMC is correct that the Final Statement of Basis, which was issued before DEC chose to proceed unilaterally, does not address that question. However, DEC's decision to proceed unilaterally demonstrates it determined that path was cost-effective. Subdivision (5)(d) exempts DEC from having to reduce the grounds for that determination to writing and, other than a conclusory allegation that private action is always cheaper than public action, FMC has proffered nothing under the four statutory factors or otherwise to contradict the presumption that DEC's action was reasonable under the circumstances.[4] DEC's year-long unsuccessful *386 **918 negotiations to obtain FMC's agreement to perform the work provides record evidence that relying on FMC ***343 was not a cost-effective alternative for performing CMA 9 -indeed, FMC refused to do so.[5] Thus, under the parties' interpretation of section 27-1313(5)(d), DEC had the authority to implement the remedial program itself.
Having established that title 13 provides an avenue for DEC to use the state superfund to unilaterally remediate the relevant properties, it remains only for DEC to establish that it met the additional conditions imposed by the state superfund statute. When proceeding under title 13-although not when proceeding under title 9-that statute requires DEC, absent exigent circumstances, to have first made "all reasonable efforts to secure voluntary agreement to pay the costs of necessary remedial actions from owners" ( State Finance Law § 97-b[4] ). "Voluntary agreement" requires something less than a section 27-1313(4) order and hearing, which may not be voluntary at all. Here, DEC's conducting a year of negotiations only to be told that FMC cannot see any mutually-agreed upon path forward is more than the statute requires. The statute's other requirement-that DEC later make "all reasonable efforts to recover the full amount of any funds expended" ( id. § 97-b[6] )-will be fulfilled in a CERCLA cost recovery action in federal district court. That action will provide FMC with an opportunity for a hearing to dispute its liability, as DEC has repeatedly acknowledged throughout the course of this proceeding.
Accordingly, the order, insofar as appealed from, should be reversed, with costs, the petition dismissed, and the certified question answered in the affirmative.
Order, insofar as appealed from, reversed, with costs, petition dismissed and certified question answered in the affirmative.
Chief Judge DiFiore and Judges Rivera, Stein, Fahey and Feinman concur. Judge Garcia took no part.

Although interim status "shall not be deemed to be a permit" and is not granted by way of "an order issued by the commissioner", conduct in compliance with the performance standards for interim status is "exempt ... from the requirements of possessing" a permit (ECL § 27-0913[1][b] ; id. § 71-2702[3] ; see also id. § 71-2720 [1] ).

FMC does not dispute that any "prospective" release of hazardous wastes would violate the performance standards governing interim status. However, it is not clear what "prospectively" means. The sections may apply to violations that occurred after the relevant regulations were promulgated or after either the specific sections or the title generally were enacted. They may also apply (as the contemporary definition of "authorization" would suggest) to violations of requirements "set forth in statute, rule, or regulation", including statutes such as RCRA or the Clean Water Act that predate title 9 (L 1981 c 719 § 12)-or, in light of the sweeping corrective actions title 9 authorizes DEC to order, to violations that would have sounded in nuisance or trespass at the common law and are now codified in the straightforward restrictions of section 27-0914. Guides to how best to interpret the sections may be found in our statutes, including title 9's interplay with title 13's careful scheme for legacy sites, in their legislative history, and in their federal counterparts, but we do not attempt to resolve that question here, because it is unnecessary to our decision and scantily briefed by the parties.

Subdivision (3)(b), added to the section at the same time as subdivision (5)(c) and (5)(d), sets forth the test used to determine whether exigent circumstances authorize DEC to proceed unilaterally and without a hearing. It applies when DEC finds, in writing, that there exists not only the significant threat to the environment required by subdivision (3)(a) but also that the threat in question "presents an imminent danger of causing irreversible or irreparable damage to the environment and ... makes it prejudicial to the public interest to delay action until a hearing can be held." It also applies when the Department of Health makes analogous findings regarding imminent dangers to life or health.

Although we have no cause to speculate as any additional ground(s) on which DEC alighted, it may have determined its costs were cheaper than FMC's; or that FMC's costs were irrelevant in light of its refusal to implement the program; or that DEC expected to recoup its costs in a CERCLA proceeding and determined those litigation expenses would be less than the expense of litigating a section 27-1313 order; or that the costs of remediating after a lengthy hearing would exceed the costs of remediating now; or that any additional costs incurred in a DEC-led cleanup were justified by remediating a significant threat to life and health and the environment years earlier than the order-and-hearing alternative would allow.

FMC's April 24, 2014 email to DEC concluded, "FMC does not see a mutually agreeable path forward to allow us to proceed with signing a new agreement ... Accordingly, we are considering dispute resolution options."